**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **RAQUEL GORDON,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:06cv861** |
| | ) | |
| **CARLOS GUTIERREZ,** | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

At issue on summary judgment in this employment discrimination case is whether

plaintiff has presented competent evidence sufficient to create a triable issue of fact with respect

to her claims of sex and race discrimination, hostile work environment, and retaliation.

**I.**

The summary judgment record reveals the following facts.[1]  Plaintiff, an African-

American woman, was employed as a patent examiner in the United States Patent and Trademark

Office ("USPTO") from 1994 until she was terminated in July 2005.[2]  Originally trained as an

electrical engineer, plaintiff is also an attorney and a member of a neighboring state's bar.[3]  At

---

[1] As is appropriate when resolving a motion for summary judgment, all genuinely disputed issues of material fact are resolved in favor of the non-movant.  Rule 56, Fed. R. Civ. P; *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

[2] Although plaintiff raises no wrongful or discriminatory termination claim in this case, it appears that she has presented such a claim to the Merit Systems Protection Board, though it was ultimately dismissed.

[3] As such, plaintiff is not entitled to the liberal construction of pleadings ordinarily afforded *pro se* litigants.  *See e.g. Smith v. Plati,* 258 F.3d 1167, 1174 n.6 (10th Cir. 2001); *Olivares v. Martin,* 555 F.2d 1192, 1194 n.1 (5th Cir. 1977); *Grossman v. Motley,* 1987 WL 15268 at *2 n.1 (E.D.N.Y. 1987).  *See also Gordon v. Gutierrez,* No. 1:06cv861 (E.D.Va. Dec. 14, 2006) (order granting motion to dismiss).

the time of her termination in 2005, plaintiff has achieved GS-14 status, having earned timely promotions throughout the period of the alleged discrimination.

According to plaintiff, the alleged discrimination commenced in 1998 when plaintiff was a GS-12 patent examiner working under the supervision of Nancy Le.  It appears that in 1998 the social relationship she had developed with Le changed abruptly when, as plaintiff claims, Le and her husband repeatedly importuned plaintiff to become sexually involved with them.  Plaintiff refused, and reported Le's inappropriate and unwelcome sexual advances to Margaret Focarino, then plaintiff's second-level supervisor, and requested a transfer to another Art Unit.[4]  This request was granted and, in October 1998, plaintiff was transferred to Art Unit 2853[5] with a new supervisor, Ben Fuller, who was in turn replaced by John Barlow in May 1999.  Plaintiff focuses her surviving discrimination claims on Barlow's management of plaintiff's workload and docket, particularly while plaintiff was on the signatory review program.  A brief description of the signatory review program and of the USPTO's work assignment policies is therefore necessary context for plaintiff's claims.

Patent examiners at the USPTO are grouped by technology into Technology Centers, which are further subdivided into Art Units.  Patent applications are also classified by technology and routed to the appropriate Technology Center and Art Unit.  Since examiners within each Art

---

[4]This alleged harassment, if proved, would likely constitute a Title VII violation, but because these allegations are time-barred they did not survive a threshold dismissal motion.  *See Gordon v. Gutierrez*, No. 1:06cv861 (E.D.Va. Dec. 14, 2006) (order granting motion to dismiss).

[5]This Art Unit was originally labeled Art Unit 2108, but was later relabeled.

Unit examine similar technology, USPTO management routinely transfers cases[6] among examiners in that unit (and other units examining similar technology) to ensure that the cases are timely processed.  Management attempts to accommodate, within reason, examiners' preferences to examine particular technologies within their area or areas of expertise, especially when examiners are on the signatory review program (explained below), as this aids examiners in meeting their production quotas.  This policy is embodied in the examiners' union contract, which provides that "to the extent consistent with the interests of the Office, every reasonable effort will be made to allow examiners in GS Grade 13 and above to maintain their assigned dockets."  Nonetheless, no examiner has a right to examine any particular type of case or to limit her assigned cases to one particular area of technology; indeed, it is expected that examiners will learn new areas of technology and art as they advance within the USPTO.  Plaintiff's area of expertise was examining patent cases concerning particular types of inkjet printer heads, which the USPTO designates as subclasses 347/54 and 347/55.[7]  Her Art Unit examined these subclasses, as well as other subclasses within class 347.

     Plaintiff's claim of disparate treatment focuses particularly on the nature of her workload while she was on the signatory review program, and hence this program merits further description.  Examiners who complete the signatory review program attain the title of "primary

---

[6]Consistent with the parties' usage, the term "case" is used herein to refer to patent applications under review at the USPTO.

[7]While working under Le, plaintiff specialized in classes 347/111-160 ("electric marking apparatus or processes"); after transferring to Fuller's supervision, plaintiff specialized in classes 347/54-55.  Plaintiff's submissions reflect that she viewed classes 347/54 and 347/55 as her area of expertise, and the analysis therefore proceeds on the assumption that receiving cases outside classes 347/54-55 is the injury plaintiff complains of here.

examiners" and have "signatory authority," in other words, authority to take "office actions"[8] on some matters without the approval of supervisors.  The signatory review program proceeds as follows.  On promotion to GS-13, a patent examiner spends approximately six months in the partial signatory review program, meaning she has temporary partial signatory authority.  If her work there is satisfactory and she meets certain goals,[9] she is given permanent partial signatory authority for an interim period of six months before beginning the full signatory review program. That program mirrors the partial signatory review program: the examiner has temporary full signatory authority for six months, and her work during that time is reviewed by supervisors; if the examiner's work is qualitatively satisfactory and she meets the quantitative production goals, she is granted permanent full signatory authority, subject to a probationary period.

Plaintiff complains chiefly of her case assignments and lack of petition and classification work.  She asserts that she received improper work assignments, namely cases outside her areas of expertise, which made it more difficult for her to meet her production quotas and target error rates while on the signatory review program.  She further asserts that comparably situated white males received a greater share of cases from their preferred areas while on the signatory review program than she did.  She identifies two white male comparators: Craig Hallacher and Michael Brook, both of whom worked as examiners in John Barlow's Art Unit along with plaintiff, but

---

[8]"Office actions" are communications by the examiner to an applicant or his attorney or agent concerning the application.  Only primary examiners may be responsible for certain office actions, including final rejection and withdrawal of a final rejection of an application.  *See Manual of Patent Examining Procedure* § 1004 (8th ed. 2001, rev'd 2006).

[9]These goals include completing examination of a certain number of cases within a specified period of time and doing so without exceeding a certain error rate.  These goals become more demanding at each stage of the signatory review program.

were junior to her.  Hallacher's affidavit reflects that he is equally able to examine all types of

cases within the Art Unit, and so did not share plaintiff's distress at receiving cases outside his

area of expertise.  No affidavit from Brook appears in the record, nor does the record contain any

documentary evidence regarding Brook's docket.  (The record does reflect that Brook failed to

complete the signatory review program on at least one attempt.)  Manish Shah, who worked in

the same Art Unit as plaintiff, also avers that he has worked on cases within the general art area

for which the Art Unit was responsible, but outside his narrower area of expertise.

The record evidence also includes USPTO docket sheets, which confirm that while on the

partial signatory review program, plaintiff worked on many cases within her area of expertise, as

well as many outside of it, and that other examiners also worked on cases within plaintiff's area

of expertise.  As of the two-week period ending November 6, 2000,[10] plaintiff had five "regular"

cases in her area of expertise on her docket, while her peer examiners had twenty such cases and

supervisors had fourteen.[11]  At that time, plaintiff's docket also included five "amendment" cases

from her preferred subclass, compared with three "amendment" cases from other areas,[12] and two

"other special" cases, one of which was from within her preferred subclass.  Moreover, plaintiff's

docket at that time included thirty five "regular new" cases from her preferred subclass and eight

---

[10]Plaintiff began the partial signatory review program in June 2000 and completed it in December 2000.

[11]Specifically, Robert Loper had ten such cases on his docket, Matthew Welker had seven, and Thien Tran, David Yockey, and Shin Wen Hsieh had one each.  John Barlow had thirteen such cases on his docket and Nancy Le had one.

[12] Specifically, subclasses 347/16, 347/102, and 347/151.

cases from other subclasses.[13]  In sum, the record reflects that plaintiff had forty six cases from her preferred subclass and twelve from other areas on November 6, 2000.

Likewise, during the interim period between the partial and full signatory review programs, plaintiff had a similar mix of work – some cases within her area of expertise and some without – and moreover, during that time other examiners received cases within plaintiff's area of expertise.  USPTO documents dated March 12, 2001, at which time plaintiff had completed the partial signatory review program but had not begun the full signatory review program, confirm that examiners Robert Loper, David Yockey, and Matthew Welker, had cases from subclasses 347/54-55.  Another document states that as of March 14, 2001, also during the interim period, plaintiff had forty "rejected" cases, of which thirty five were from her preferred subclass, that plaintiff further had eleven "regular amended" cases, of which ten were from her preferred subclass, and that plaintiff had eight "regular new" cases, all of which were from her preferred subclass.  The record also contains an undated memo from Barlow to plaintiff explaining that sixteen cases, all in her preferred subclass, would be transferred to plaintiff's docket.  Assuming the sixteen cases were transferred during March 2001, Plaintiff had seventy cases from her preferred subclass and only six from other subclasses.

The evidence concerning plaintiff's docket while on the full signatory review program suggests a similar conclusion: that she had cases from both within and without her stated area of expertise.  A set of documents, dated June 4, 2001, states that plaintiff had eight "regular new" cases, of which six were from her preferred subclasses, 347/54-55.  No evidence from this date

---

[13] Namely, subclasses 347/78, 347/49, 347/46, 347/7, 347/75, 347/68, 347/15, and 347/19.

about others examiners' dockets is provided.

In sum, the record contains no other evidence of plaintiff's docket at the disputed points.[14] Importantly, apart from Hallacher's affidavit, there is no documentary evidence of the comparators' dockets in the record.

There is also testimony, although not undisputed, that plaintiff's preferred art area was "dwindling" (i.e. that fewer patent cases in that area were being received), which explained in part why she was compelled to examine more cases outside her art area than she would have been otherwise. The docket sheets described above do not conclusively prove or rebut this point, though they do confirm that during the period November 2000 to June 2001, there were a significant number of pending cases at the USPTO in classes 347/54 and 347/55.

In addition to the assignment of cases, plaintiff complains that Barlow discriminated against her in assigning petition and classification work. Classification is the process whereby cases are sorted into appropriate art classes and subclasses, a process that helps determine which examiners will be assigned to receive them. Although classification in Barlow's Art Unit was, at one point, performed only by two white males, Craig Hallacher and Joe Hartary, the record reflects that this was the practice of Barlow's predecessor Ben Fuller, and that Barlow merely

---

[14]While the affidavit of Randy Myers does purport to offer evidence about plaintiff's docket, some portions thereof are inadmissible insofar as they offer testimony about the contents of documents, such as docket sheets and performance appraisal plans. *See* Rule 1002, Fed. R. Evid. Since they are inadmissible, those statements are not properly considered on summary judgment. *See* Rule 56(e), Fed. R. Civ. P ("opposing affidavits . . . shall set forth such facts as would be admissible in evidence."). Insofar as Myers' statements about plaintiff's docket concern documents in the record, those statements are unnecessary and unhelpful. In other words, Myers' statements about documents concerning plaintiff's docket not in the record are not admissible, whereas his statements characterizing documents in the record are duplicative and unnecessary.

continued this arrangement for some time after taking over the Art Unit.  Moreover, Barlow changed this policy on plaintiff's request and made opportunities to classify available to all the examiners in his Art Unit, including plaintiff.

Plaintiff also complains that the location of the classification process was discriminatory. Applications to be classified were first kept only in Hartary's office, then in Barlow's office, then in Hallacher's office.  When plaintiff complained to Barlow about having to go to Hallacher's office to work on classification, Barlow responded by maintaining all the applications to be classified in his office, where all examiners would have equal access to the applications.

As for petitions (which are requests for the USPTO to waive specific rules or take other extraordinary action), the record reflects that Barlow's Art Unit seldom handled such petitions, but on those occasions when petitions did require resolution by Barlow's Art Unit, he sometimes resolved the matter himself.  Moreover, on at least one occasion Barlow sought plaintiff's input in drafting a response to a petition.  The circumstances of this request are disputed, however, as plaintiff contends Barlow intentionally made the request at a time when she was too busy to work on the petition.  Analysis proceeds on the assumption that plaintiff is correct in this regard.

Importantly, Barlow has always reviewed plaintiff's work favorably, deeming it "commendable" or "outstanding."  The record further reflects that Barlow has never counseled plaintiff that her quality or quantity of work product was inadequate or in danger of becoming so. The record also reflects that, although Barlow expected plaintiff to examine applications outside her core areas of expertise, she was granted a "learning curve" for her performance in examining other areas; that is, her work would not be held to the same expectations of quantity and quality

in the new art areas as in the art areas with which she was familiar.[15]   The record also reflects that plaintiff progressed through the signatory review program in the minimum possible time, as she began the partial signatory program in June 2000, completed it in December 2000, then began the full signatory program in May 2001, and completed it in November 2001.   Moreover, the record reflects that plaintiff won timely promotion to GS-14.   Indeed, at Barlow's recommendation, plaintiff was promoted to GS-13 in January 2000, and to GS-14 in December 2001.

One instance of conflict or tension between plaintiff and Barlow occurred in February 2001, when plaintiff transferred some cases off her docket and onto Barlow's docket without his permission, in violation of office policy.   Barlow verbally counseled plaintiff against this practice in the presence of another supervisor, Georgia Epps.   Though plaintiff contends Epps' presence was intended to embarrass plaintiff, the record reflects that giving verbal warnings in the presence of another supervisor was consistent with office policy.

Plaintiff contacted an EEO counselor on March 16, 2001, and thereafter, on May 25, 2001, she filed a complaint with the Equal Employment Opportunity Commission complaining of the conduct alleged here.   The administrative complaint was limited to plaintiff's claim that

> because of her race (African-American), sex (female), and color (black) she has been subject to an ongoing pattern of discrimination by her supervisor, John Barlow, who has repeatedly treated her differently than white males in her Art Unit, and has hindered her preparation for promotion to GS-14, the most recent event being March 15, 2001, when he counseled her for using the wrong procedures to transfer her cases to other examiners.

---

[15]For example, the USPTO goal of taking some action on all new cases within fourteen months was waived for plaintiff's cases outside her area of expertise.

The administrative law judge granted summary judgment for the government,[16] and plaintiff now

seeks and is entitled to *de novo* review of her exhausted claims.  As a result of these facts,

plaintiff alleges she was discriminated against on the basis of race, color, sex, and in retaliation

for having filed a formal Equal Employment Opportunity administrative complaint. Plaintiff

originally named as defendants Secretary of Commerce Carlos Gutierrez in his official capacity,

and USPTO employees Margaret Focarino, Nancy Le, John Barlow, and Howard Goldberg in

their individual capacities.  All defendants except Gutierrez have been dismissed.  *See Gordon v.*

*Gutierrez*, No. 1:06cv861 (E.D.Va. Dec. 14, 2006) (order granting motion to dismiss).

## II.

Summary judgment should be granted where the record shows "there is no genuine issue

as to any material fact and the moving party is entitled to judgment as a matter of law," Rule

56(c), Fed. R. Civ. P.  Thus, summary judgment on a claim is appropriate unless plaintiff

demonstrates that a triable issue of fact – that is, a genuinely disputed issue of material fact –

exists as to each element of that claim for which plaintiff bears the burden of proof at trial.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A mere scintilla of evidence is insufficient

in this regard; the evidence must be sufficient for a reasonable factfinder to find in the

nonmovant's favor on the disputed element.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252

(1986).  And where a summary judgment motion is made and adequately supported, the

nonmovant may not merely rest on allegations in the pleadings, but must set forth by affidavit or

otherwise specific facts demonstrating that a triable issue of fact exists.  Rule 56(e), Fed. R. Civ.

---

[16] Plaintiff does not allege she received a right to sue letter as a result of this adverse
determination, and no such letter appears in the current record.

P.  With these principles in mind, the analysis proceeds to the merits of plaintiff's Title VII

claims.

*1. Hostile Work Environment*

To establish a claim of hostile work environment, a plaintiff must show "(1) that she was

harassed 'because of [her membership in a protected class]'; (2) that the harassment was

unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive

working environment; and (4) that some basis exists for imputing liability to the employer."

*Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir. 1997).  The first requirement – that

harassment occur because of plaintiff's membership in a protected class – is satisfied only when,

but-for her membership in that class, she would not have been a victim of discrimination.  *Id.*

In deciding whether a work environment is actionably hostile, *i.e.* if harassment was severe and

pervasive, courts must consider the totality of the circumstances, including "the frequency of

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance, and whether it unreasonably interferes with an employee's work

performance."  *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993).  The discriminatory conduct

must be so "extreme [as] to amount to a change in the terms and conditions of employment,"

*Farragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988).  This requires that (i) a reasonable

person would objectively perceive the environment to be abusive and (ii) the plaintiff

subjectively perceived the environment to be abusive.  *Harris*, 510 U.S. at 21.

Plaintiff's hostile work environment claim fails to meet this standard.  Putting aside

plaintiff's time-barred allegations regarding Le, plaintiff's proof falls far short of a work

environment so permeated with severe, pervasive abuse as to effectively alter the conditions of

plaintiff's employment.  The actions complained of essentially involve assignment and scheduling of work, namely that plaintiff received patent applications from areas of technology with which she was familiar, that she was not permitted to help classify applications and work on petitions, or not permitted to do so under ideal circumstances.  Even the counseling complained of grew out of plaintiff's transferring cases off her own docket onto Barlow's.  While there was some workplace tension between plaintiff and Barlow, there is no evidence that Barlow's treatment of plaintiff was objectively abusive, derogatory, or motivated by sex- or race-based animus.  Dissatisfaction with work assignments and one incident of verbal counseling regarding workflow management falls far short of an objectively abusive work environment.  Indeed, it is far less objectionable than other conduct the Fourth Circuit has held to not state a claim for hostile work environment.  *See Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) (numerous comments such as "we've made every female in the office cry like a baby" and "fetch your husband's slippers like a good wife," and references to employees as "slaves" and "little people" not sufficiently severe or pervasive to state a hostile work environment claim.").  A reasonable employee would not believe the conduct complained of to constitute severe or pervasive abuse.

Moreover, even assuming the conduct complained of constituted harassment, there is nothing in the record (aside from plaintiff's bare assertions and hunches) indicating that cases were assigned or refused to plaintiff out of discriminatory animus based on race or sex, or in reprisal for the exercise of her EEO rights.  Instead, uncontradicted testimony reveals that cases of all types were frequently transferred among examiners to meet office goals, that all examiners were given some cases outside their areas of expertise or preference, and that examiners were

12

expected to develop competence in technological areas outside the ones with which they were most comfortable as a condition of advancement within the PTO.  No reasonable trier of fact could find that plaintiff's work environment was abusive, or that a connection existed between the alleged harassment and plaintiff's membership in a protected class.

## 2. *Disparate Treatment*

Plaintiff also raises a claim of discrimination based on disparate treatment.  Such discrimination is forbidden by 42 U.S.C. § 2000e-16, which provides in pertinent part that "all personnel actions affecting employees . . . in executive agencies . . . shall be free from any discrimination based on race, color, religion, sex, or national origin."  This provision has been construed as forbidding discrimination on substantially the same terms as it is forbidden in the private sector by 42 U.S.C. § 2000e-2.  *See King v. Dalton*, 895 F. Supp. 831, 837-38 (E.D.Va. 1995) (§ 2000e-16 was intended to give public employees the same substantive rights and remedies previously provided for private sector employees) (citing *Douglas v. Hampton*, 512 F.2d 976, 981 (DC Cir. 1975)).[17]

Because plaintiff presents no direct evidence of sex- or race-based animus, she must proceed under the inferential proof scheme of *McDonnell Douglas* and its progeny.  The elements of such a claim are well known: plaintiff establishes a prima facie case of discrimination by establishing (i) that she is a member of a protected class, (ii) that her job performance was satisfactory, (iii) that she was subject to an adverse employment action by her

---

[17] Sections 2000e-2 and 2000e-16 are to be construed identically only so far as the statutory text permits.  *King v. Dalton*, 895 F. Supp. at 837.  Yet there is no pertinent difference between § 2000e-2 and § 2000e-16 with respect to the disparate treatment claim raised herein, and cases construing § 2000e-2 are relevant to the application of 2000e-16 in this context and are cited accordingly.

employer, and (iv) that similarly situated employees outside her protected class received more favorable treatment. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). *See also Page v. Bolger*, 645 F.2d 227, 231-32 (4th Cir. 1981); *Combs-Burge v. Rumsfeld*, 170 Fed. Appx. 856, 862 (4th Cir. 2006); *Williams v. Henderson*, 129 Fed. Appx. 806, 813 (4th Cir. 2005) (all applying *McDonnell Douglas* framework to actions under § 2000e-16). If plaintiff makes the prima facie case, the burden shifts to the employer to present a legitimate nondiscriminatory reason for the action, which, if shown, the employee may then attack as pretextual. *McDonnell Douglas*, 411 U.S. at 802-04. To survive summary judgment, plaintiff must demonstrate that a triable issue of fact exists as to each element of the prima facie case. The first two elements are uncontested; plaintiff's race and sex are protected classes and there is no reasonable dispute that plaintiff performed her job well.

Nevertheless, no triable issue of fact exists as to the third element of a disparate treatment claim, as no reasonable trier of fact could find plaintiff suffered an adverse employment action at the hands of Barlow. This element requires a showing that plaintiff was discriminated against with respect to the "terms, conditions, or privileges" of her employment. 42 U.S.C. § 2000e-2(a); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004) (internal citations omitted). An adverse employment decision need not be an "ultimate employment decision" such as hiring, firing, or refusing to promote, instead, "adverse employment action includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the terms, conditions, or benefits of employment." *Von Gunten v. Maryland*,

14

243 F.3d 858, 866 (4th Cir. 2001).[18]  Yet, not every aspect of an "employee's daily work experience is a 'term, condition or benefit' of employment that can give rise to a federal cause of action if changed or withdrawn," otherwise, "every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."  *Peary v. Goss*, 365 F. Supp. 2d 713, 722 (E.D.Va. 2005) (citing *Von Gunten*, 243. F.3d at 865, and *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996), respectively)).  In particular, reassignment to a less appealing job is not an adverse employment action unless it has a "significant detrimental effect," such as a "decrease in compensation, job title, level of responsibility, or opportunity for promotion."  *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999).  Moreover, such a reassignment is not an adverse employment action even if the new assignment is more stressful than the old.  *Id.* at 263.

It is unmistakably clear from this record that no adverse employment action was taken against plaintiff.  Plaintiff received raises and promotions on schedule; indeed, there is no dispute that plaintiff received commendable evaluations from Barlow, was timely promoted through the signatory review program, and was timely promoted to GS-14 at Barlow's instigation.  Plaintiff alleges no decrease in pay, benefits, or job title.  Moreover, the one incident of verbal counseling complained of clearly falls short of affecting the terms or conditions of plaintiff's employment.

Importantly, the matters chiefly complained of, plaintiff's dissatisfaction with the work

---

[18]Although *Von Gunten* is no longer good law insofar as it held that private-sector plaintiffs asserting Title VII retaliation claims must show employer action affecting the terms or conditions of employment, *see Burlington Northern and Santa Fe Rwy v. White*, __ U.S. __, 126 S.Ct. 2405 (2006), *Von Gunten*'s extensive discussion of what constitutes an adverse employment action remains good law and is applicable in disparate treatment suits.  *See Peary v. Goss*, 365 F. Supp. 2d 713, 723 n.11 (E.D. Va. 2005) (applying *Von Gunten* in a discrimination suit) (citing cases).

15

she received, do not rise to the level of an adverse employment action.  First, the record

demonstrates that plaintiff did not have a right or expectation that she would be assigned any

particular set of cases.  Plaintiff's asserts such a right or expectation exists because the labor

agreement so provides, but that agreement implicitly acknowledges that management retains final

discretion over assignments, and it explicitly provides that examiners would retain their

customary docket only "to the extent consistent with the interests of the Office" and that

management need only make "reasonable efforts" to accommodate examiner's preferences to

examine within particular areas.  The record further reflects that Barlow did so; he did in fact

assign plaintiff many cases in her area of expertise and interest.  Importantly, the record also

demonstrates that other examiners in Barlow's Art Unit, Shah and Hallacher, received a mix of

cases, *i.e.* some from within their preferred subclass, some from outside it.[19]  In short, plaintiff

cannot show a triable issue of fact on the issue of disparate treatment because she has not shown

that the mix of cases she received was significantly less favorable than the mix of cases provided

to the comparators; indeed, the record is devoid of any evidence at all regarding Brook's docket,

and the affidavit from Hallacher suggests that his assignments were similar to plaintiff's.

Moreover, even assuming plaintiff received a somewhat less desirable mix of

assignments than others in her Art Unit, this would not constitute an adverse employment action.

The difference between the cases she sought to receive and the cases she did receive is simply not

significant enough to be actionable under Title VII.  Cases involving job transfers or

reassignments are instructive, as the Fourth Circuit and other courts have held that changes in an

---

[19]For this reason, plaintiff also fails to raise a triable issue of fact on the fourth element of
a disparate treatment claim: that she was treated differently from those outside her protected class
with respect to a term or condition of employment.

employee's responsibilities or assignments far more dramatic than those complained of here do not constitute adverse employment action. *See e.g. Von Gunten*, 243 F.3d at 868 (environmental health aide's reassignment involving "more shoreline duty, less boat work, and more interaction with the public" did not constitute an adverse employment action); *Boone v. Goldin*, 178 F.3d 253, 263 (4th Cir. 1999) (electrical engineer's reassignment from acoustics lab to wind tunnel was not adverse employment action, noting that "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position"); *Peary v. Goss*, 365 F. Supp. 2d at 722-26 (CIA officer's reassignment from one intelligence-gathering location to another, riskier one in the same country not adverse employment action). *Accord James v. Booz-Allen*, 368 F.3d at 376 ("the mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action. A reassignment can only form the basis of a valid Title VII claim if the plaintiff can show the reassignment had some detrimental effect."). Title VII simply does not address the "trivial discomforts endemic to employment," a moniker which befits the differences in assignments complained of here. *See Boone v. Goldin*, 178 F.3d at 256. Plaintiff's subjective dissatisfaction with her work assignments is not actionable when it produced no detrimental effect on the terms or conditions of her employment. Therefore, summary judgment on plaintiff's disparate treatment claim is appropriate.

*3. Retaliation*

Plaintiff also asserts that she was retaliated against for protected EEO activity. Although the protected activity is not specifically identified in the parties' moving papers, it must be

plaintiff's filing of an EEO complaint on May 25, 2001 or plaintiff's reporting of Le's harassment to Focarino in 1998.

The prima facie elements of a retaliation case are: (i) plaintiff engaged in a protected activity, (ii) her employer took a materially adverse action against her, that is, an action that would tend to dissuade a reasonable employee from making or supporting a charge of discrimination,[20] and (iii) the retaliation was causally connected to the protected activity.  *See Burlington Northern and Santa Fe Rwy v. White*, __ U.S. __, 126 S.Ct. 2405, 2415 (2006) (material adverse action standard); *Munday v. Waste Management, Inc.*, 126 F.3d 239, 242 (4th Cir. 1997) (elements of retaliation generally under § 2000e-3 ); *see also Cciscmann v. Sallada*, 2006 WL 3611729 at *4 (4th Cir. 2006) (discussing private sector retaliation after *Burlington Northern*).  Plaintiff's filing of an EEO complaint is clearly protected activity, and her reporting of Le's alleged harassment to Focarino is protected oppositional activity; the first element is satisfied here.  *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 273 (4th Cir. 2001) (EEO complaint protected); *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998) (opposition activity "encompasses utilizing informal grievance procedures" and "voicing one's opinions in order to bring attention to an employer's discriminatory activities.").

The record reflects that plaintiff has failed to demonstrate the second element, as no reasonable factfinder could find that plaintiff suffered an employment action that would deter a

---

[20]The government urges that a federal employee alleging retaliation under Title VII must show an adverse employment action, *i.e.* a change in the terms, conditions, or privileges of employment, even after *Burlington Northern.*  As explained below, plaintiff fails to show a triable issue of fact whether the requisite showing is a change in the terms or conditions of employment, or merely materially adverse action by the employer.

reasonable employee from making or supporting a charge of discrimination.[21]  The adverse

actions alleged, such as receiving unfavorable assignments, verbal counseling, unfavorable

reviews, and denial of opportunities for advancement, are either disproved or legally insufficient.

The circumstances of the verbal counseling here would not discourage a reasonable employee

from filing an EEO complaint, as it is clear from the record that the counseling was deserved (in

response to plaintiff's inappropriate transfer of her cases onto Barlow's docket), properly

conducted (in the presence of another supervisor, Epps), and resulted in no further disciplinary

action against plaintiff.  Plaintiff's allegations of unfavorable reviews and denial of promotion

opportunities are conclusively disproved by the record; indeed, in her deposition plaintiff

admitted that Barlow gave her only favorable reviews and that she successfully and in timely

fashion progressed through the signatory review program.  That leaves only plaintiff's complaints

about her work assignments.  Ensuring that an EEO plaintiff received an unfavorable work

assignments might arguably discourage a reasonable employee from bringing a Title VII

complaint; indeed, *Burlington Northern* anticipated this possibility.  *See Burlington Northern*,

126 S.Ct. at 2416 ("one good way to discourage an employee . . . from bringing discrimination

charges would be to insist that she spend more time performing the more arduous duties and less

time performing those that are easier or more agreeable.").  Yet plaintiff has made no showing,

aside from her own self-serving statements, that her docket was more unfavorable than those of

anyone else in her Art Unit.  To the contrary, the evidence in the record demonstrates that

plaintiff's docket at all times was essentially similar to others in her Art Unit: some of her cases

---

[21]Of course, since the employment actions taken against plaintiff fail to satisfy the *Burlington Northern* standard, they would necessarily fail the more demanding "terms, conditions, or privileges of employment" standard urged by the government.

were within her area of expertise, some were outside it.  Moreover, the record establishes that

plaintiff's work in unfamiliar areas was treated more leniently, with exemptions from time and

production goals.  Plaintiff also complains of being denied opportunities to classify applications

and to train junior examiners, asserting that her opportunities for promotion were hindered

thereby.  If true, this would deter a reasonable employee from filing a discrimination complaint,

yet the record demonstrates that plaintiff was in fact timely granted signatory authority and timely

promoted to GS-14.[22]  A reasonable employee would not likely be dissuaded from filing a

discrimination complaint on account of being denied additional work, when such additional work

would not in fact affect their chances for promotion.

   Moreover, even assuming plaintiff were able to adduce evidence of a cognizable

retaliatory employment action, she fails to establish a triable issue of causation.  As plaintiff

offers no direct evidence, causation, if it exists, must be inferred from temporal proximity

between the allegedly retaliation and the protected activity.  *See Williams v. Cerebonics, Inc.*, 871

F.2d 452, 457 (4th Cir. 1989) (temporal proximity alone can establish the causation prong of a

prima facie case of retaliation).  Yet no such inference can be drawn here.  Importantly, the only

evidence comparing plaintiff's docket to those of other examiners begins in November 2000 and

---

[22]Plaintiff alluded at oral argument to the possibility that the denial of these opportunities may have hindered her promotion not just from GS-12 to GS-13 and -14, but also to Senior Executive Service.  Yet the evidence focuses exclusively on plaintiff's docket and performance in 2000 and 2001, while she was a GS-13, on the signatory review program, and under evaluation for promotion to GS-14.  To the degree plaintiff contends inadequate classification duties and denial of opportunities to train junior examiners hindered her promotion to SES in some unspecified later year, the record is wholly devoid of any supporting evidence, aside from plaintiff's self-serving assertions, that (i) plaintiff was denied opportunities to classify, and that (ii) Barlow's conduct was pertinent to any such non-promotion.  Indeed, no evidence regarding a promotion or non-promotion to SES appears in the record at all.

concludes in June 2001.  Since plaintiff's EEO complaint was filed May 25, 2001, any alleged

retaliation occuring before that date could not be caused by the complaint, and the scant evidence

regarding plaintiff's docket in June 2001 is insufficient to support a retaliation charge.  Thus, the

retaliation analysis must focus on plaintiff's report of Le's advances to Focarino in 1998.   The

parties dispute when Barlow learned of plaintiff's complaint about Nancy Le to Focarino, and of

course, any allegedly adverse action Barlow took against plaintiff before learning of plaintiff's

complaint to Focarino could not be caused by the protected activity and therefore would not be

actionable.  The government contends Barlow did not learn of plaintiff's complaint to Focarino

until plaintiff told him in June 2000, while plaintiff contends Barlow may have learned earlier

since, it is averred, Le and Barlow dined together regularly once Barlow became a supervisor in

May 1999.  Since Barlow learned of the protected activity in June 2000 at the latest, and the

evidence concerning retaliatory work assignments commences in November 2000, there is a time

gap of at least five months between the protected activity and the putatively retaliatory work

assignments.  Given this length of time and the absence of any other evidence that plaintiff's

work assignments were altered in response to plaintiff's complaint to Focarino, a reasonable jury

could not draw an inference of causation.  *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir.

2003) (ten week lapse of time between retaliatory act and protected activity "weaken[ed]

significantly" but did not defeat inference of causation because other evidence suggested

causation); *Hooven-Lewis v. Caldera*, 249 F.3d at 278 (six month lapse negates inference of

causation); *accord Clark County School District v. Breeden*, 532 U.S. 268, 274 (2001) (where

mere temporal proximity is only evidence of causation, temporal proximity must be "very

close").  In sum, no triable issue of causation exists here.

For the above-stated reasons, summary judgment on plaintiff's retaliation claims is warranted.

### III.

For the reasons stated herein, the government's motion for summary judgment must be GRANTED.  An appropriate Order will issue.

_____/s_____
T. S. Ellis, III
United States District Judge

Alexandria, Virginia
January 4, 2007